The STATE of Ohio, Appellee,

v.

DELGROS, Appellant.

[Cite as *State v. Delgros* (1995), 104 Ohio App.3d 531.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 93–T–5010.

Decided June 12, 1995.

*Dennis Watkins,* Trumbull County Prosecuting Attorney, and *Patrick F. McCarthy,* Assistant Prosecuting Attorney, for appellee.

*Michael A. Scala,* for appellant.

FORD, Presiding Judge.

Appellant, Judith A. Morris Delgros, was convicted of two counts of aggravated murder with specifications by a jury on November 24, 1993, stemming from the

deaths of Donald Morris and Christopher Styles. She was sentenced to two consecutive life terms from which she perfected this appeal.

On January 3, 1978, a fire broke out at the residence of appellant and Donald D. Morris, her husband. They lived in a mobile home with Christopher Styles, John Styles and Edward Bridge, appellant's children from two previous marriages. Donald Morris and Christopher Styles were found dead, and the other two children were seriously burned, but they ultimately recovered from their injuries. Appellant did not suffer any injuries.

After the blaze, questions were raised concerning the cause of the fire, but the then County Coroner, Dr. Joseph Sudimack, determined that both bodies had been severely burned as a result of the fire and, therefore, concluded that the deaths were accidental.

Detective D'Annunzio, the investigating police officer, was treating the case as an arson/homicide. However, shortly after the fire, he was reassigned to the uniform division, and no further investigations were conducted by the police department. Subsequently, in 1993 he returned to the detective bureau, and reopened the file.

Edward Bridge, who had a lengthy criminal record and who was confined to prison in Pennsylvania stemming from a rape conviction, was contacted by D'Annunzio. After initially refusing to discuss the matter, Bridge stated that he had witnessed appellant strike Morris on the head, knocking him to the floor. According to Bridge, appellant then obtained a knife, stabbed Morris four or five times, poured some liquid by the furnace, and then set fire to the trailer.

On the basis of this information, the bodies of the decedents were exhumed. The state contacted Summit County Coroner, Dr. Samuel Cox, and Dr. Douglas Owsley, a forensic anthropologist employed by the Smithsonian Institute, who conducted independent examinations of the remains. They both concluded that Morris had sustained multiple stab wounds to the back prior to the fire.

The matter proceeded to trial, and the jury returned guilty findings. Appellant timely perfected this appeal, raising the following assignments of error:

"1. The trial court should have stricken all evidence pertaining to the defendant practicing witchcraft, as it's [sic] probative effect was exceeded by its prejudicial impact on the jury.

"2. The trial court should have denied the admission of State's Exhibits 41 thru 53 as these exhibits, which are slides of the deceased's skeletal remains, were not provided to defense counsel prior to trial, and defense counsel properly objected to their admission.

"3. The entire testimony of Dr. Samuel Cox should have been stricken from the record since the evidence he used to base his testimony on, the tissue remains of the bodies of the victims, was destroyed prior to it [*sic*] being examined by the defense expert.

"4. The trial verdict was against the manifest weight of the evidence.

"5. The trial court failed to stop the state prosecutor from asking repeated leading questions to the state's witness Edward Bridge, while the prosecutor was conducting redirect examination."

In the first assignment, appellant complains about the admission of all evidence regarding allegations that she was a "witch." She claims that such testimony, though not objected to by her attorney, should have, nonetheless, been excluded by the trial court as prejudicial.

As the fire was being controlled, a human ear with brown and gray hairs was discovered outside the trailer. It appeared as if it had been cut off by a sharp object. After contacting the hospital and the police department, both of which expressed no interest in the severed body part, the emergency medical technician, who was charged with its custody, buried the ear.

An arson investigator testified that a few months after the fire, he discovered a number of treatises on the occult in the trailer. One book in particular he described as "a witchcraft manual." When he picked up the text, he claimed that it opened to a page detailing the amputation of a human ear as part of a witchcraft ritual. The books were held as evidence, but as this matter lay dormant for more than fifteen years, these manuscripts, which were rotting and moldy, were destroyed pursuant to court order before the case was reopened.

Another witness noted that when he had viewed the bodies in the morgue, Morris appeared to be missing an ear. Even though the body had been severely burned, he noted the charred remnants of one ear but not the other.

In addition, at trial, evidence was introduced which indicated that appellant had read palms and tarot cards, and that she referred to herself as a "witch." Further, Bridge testified that his mother had practiced witchcraft, and that she had a tattoo on her arm which depicted a witchcraft charm for good luck.

Appellant's counsel did not, at any time, object to questions on this subject. His failure to do so precludes appellant from raising the issue for the first time on appeal. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. Furthermore, it was appellant's counsel who engaged in much of the colloquy on this subject. On cross-examination, he vigorously probed this issue, asking extensive questions of the

prosecution's witnesses, which highlighted the extent of the alleged witchcraft, including the amputation of the ear.

■ Even assuming, *arguendo,* that counsel had objected, we are not persuaded that the admission of such evidence was irrelevant or prejudicial. There was testimony which indicated that Morris was missing an ear. The state presented a theory to support its contention that Morris had been murdered rather than that he had perished in the blaze. It suggested that had his death been as a result of the fire, his ear should not have been discovered outside the marital abode, free from fire residue and looking as if it had been sliced from Morris's head.

Though not raised on appeal, and for the foregoing reasons, we do not perceive plain error as we are not convinced that the outcome of the trial would have been different had this testimony be excluded. See *State v. Jenks* (1991), 61 Ohio St.3d 259, 282, 574 N.E.2d 492, 509. The first assignment is overruled.

■ In the second assignment, appellant claims that the court should have excluded the slides of the skeletal remains of Morris prepared by the forensic anthropologist, Dr. Owsley. Specifically, he had examined the body and presented testimony using the actual bones during his presentation. However, at the conclusion of state's case, the prosecutor requested that the court admit the slides in evidence in place of the actual bones. After hearing appellant's objection, and conducting an *in camera* inspection of the slides and the witness's proposed testimony, the court allowed the substitution.

Appellant's challenge on appeal is that she was not afforded the opportunity to determine if the slides were a fair and accurate representation of the bones and, therefore, whether the admission of the slides into evidence was prejudicial. Counsel does not cite any authority to support this allegation, and we do not perceive any error by the court on this issue.

As noted, the court conducted a review of the slides and apparently compared them with the actual bones. (This court does not have the skeleton and, therefore, cannot make a similar evaluation.) Furthermore, appellant has not submitted any materials to this court to question the trial court's determination that the slides were representative of the actual bones. The trial court concluded that it would be appropriate for the jury to have the slides rather than the tangible remains, stating:

"THE COURT: Well, in this particular situation I find no prejudice to the defense as the actual bones were made available to the defense expect [*sic* ], and for a lot of reasons which make more sense to the Court, that rather than introducing the actual bones in this case and have that problem with the jury and also the grotesque nature of that, this Court is satisfied that the slides would be a better substitution than the actual bones themselves for numerous reasons.

Therefore your objection will be overruled and you will proceed with the introduction of the slides.

"I might also add that the Court has reviewed all those slides and they don't appear to be grotesque in the sense the bones have clearly been cleaned and show much of the skeletal remains of the deceased in this case but are purely not as grotesque as the actual demonstration of the bones themselves."

Appellant did not question the authenticity or accuracy of the slides; she objected only because they were not submitted to her prior to trial in violation of pretrial discovery obligations. While appellant did not receive the slides prior to the trial, she was not prejudiced by their submission. Her expert had the opportunity to examine the actual bones. Furthermore, the *in camera* inspection conducted by the court prior to introduction of the slides adequately protected appellant's rights. Consequently, the second assignment is without merit.

■ In the third assignment, appellant claims that the court should have stricken the testimony of Dr. Cox, as he had destroyed some tissue without affording appellant the opportunity to review it.

Both bodies were buried in the same casket. It was not watertight, and the bodies were not embalmed. As a result, the corpses began to decompose more quickly, and the various tissues and organs had deteriorated. However, Dr. Cox noted his observations regarding the decomposed tissue. He recognized a substance which in his professional opinion was indicative of premortem internal bleeding, but he did not preserve any of this material. Further, he cleaned the skeletal remains by rinsing away the decaying matter from the bones.

At the conclusion of the trial, and before closing arguments, appellant's counsel moved to strike the doctor's testimony. Appellant fails to refer to any authority that would entitle her to have a second autopsy performed or that the coroner must preserve all substances which he examines from deceased individuals. In addition, this court, in *State v. Reed* (May 31, 1991), Lake App. No. 89–L–14–130, unreported, 1991 WL 95227, failed to find error under similar circumstances, when the coroner did not make slides of tissue which he had examined, thereby precluding Reed from having her expert independently test the tissue upon which the conclusions obtained by the state's doctor were based.

Furthermore, the United States Supreme Court has opined that the state is not required to preserve all potentially useful evidence in *Arizona v. Youngblood* (1988), 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281. This position was adopted by the Tenth Appellate District in *State v. Groce* (1991), 72 Ohio App.3d 399, 401–402, 594 N.E.2d 997, 999–1000, where the court stated:

"In *Youngblood, supra,* the police failed to refrigerate clothing worn by the victim of an alleged sexual assault, which later prevented the use of DNA testing

procedures. The Supreme Court held that the failure to preserve the potentially useful evidence did not constitute a denial of due process of law:

"'The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady* [*v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215], makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. * * * We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. *We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.*' (Emphasis added.) *Id.* [488 U.S.] at 57–58, 109 S.Ct. at 337, 102 L.Ed.2d at 289. * * *"

Similarly, in this matter, the record does not contain any evidence of bad faith on the part of the state by failing to preserve samples of the decomposed tissue. Dr. Cox testified that the washing was necessary to conduct his examination of the bodies. Similarly, this cleansing was required to permit Dr. Owsley to perform his forensic analysis. Finally, appellant's experts, nonetheless, were able to form opinions regarding the cause of death and to challenge the state's experts' conclusions without examining an exemplar of the tissue at issue. The third assignment is without merit.

In the fourth assignment of error, appellant claims that the convictions were against the manifest weight of the evidence. Specifically, appellant primarily challenges the testimony of the state's only eyewitness to the murder, Bridge. Appellant claims that his testimony was so unreliable as to be incredible and, therefore, the proof of guilt could not be established beyond a reasonable doubt. We are not persuaded.

As this court recently noted in *State v. Schlee* (Dec. 23, 1994), Lake App. No. 93–L–082, unreported, 1994 WL 738452, the standard to be applied in determining whether the verdict was against the manifest weight of the evidence involves weighing the evidence to determine if "'"the jury clearly lost its way and created * * * a manifest miscarriage of justice * * *."'" *Id.* at 13, citing *State v. Davis* (1988), 49 Ohio App.3d 109, 113, 550 N.E.2d 966, 970. Further, as we noted in *Schlee,* the credibility to be afforded to each witness is for the jury to determine: "[The witnesses' credibility] is the province of the trier of fact as '[t]he jurors see

the witnesses and observe their demeanor. The credibility to be given to each and all [* * *] is for the jury.' * * * " *Id.* at 12, citing *State v. Mills* (1992), 62 Ohio St.3d 357, 368, 582 N.E.2d 972, 983.

From the record, we are unable to reach the conclusion that the jury clearly lost its way. Bridge testified that he saw appellant stab Morris repeatedly. The forensic anthropologist, based upon his examination of Morris's ribs, opined that Morris had been stabbed immediately prior to death. In his professional opinion, this had occurred before the fire. This evidence was sufficient to support the conviction for the murder of Morris.

Moreover, the severed ear created an inference that Morris had been attacked prior to the fire. His ear had been cut off and was found intact, unburned and without soot or other evidence of having been in or near a fire. This evidence is sufficient to refute appellant's claim that the fire and Morris's death were accidental in nature.

Furthermore, Bridge testified that he saw appellant pour some substance near the furnace. The prosecution offered witnesses who testified that the fire had started in two different locations. This led them to conclude that the fire had been intentionally started.

Finally, appellant's counsel challenged Bridge's credibility based upon his prior criminal record. The jury, after hearing this evidence, apparently elected to believe this witness's account of the incident. Nothing in the record demonstrates that the jury was clearly misguided, requiring a reversal. This assignment is without merit.

In the fifth assignment, appellant contends that the trial court failed to exercise sufficient control over the proceedings so as to afford appellant a fair trial by allowing the prosecution to ask leading questions on direct examination. As conceded, appellant's counsel failed to object and, therefore, waived any challenge on this issue before this court. *State v. Williams.*

Appellant, while admitting that she failed to preserve this issue by objecting at trial, attempts to suggest that the trial was so impartial as to violate her rights. Appellant relies upon *Verbanic v. Verbanic* (1994), 70 Ohio St.3d 41, 635 N.E.2d 1260, for support. However, that case is wholly distinguishable from the instant action.

In *Verbanic,* counsel's conduct was egregious. The attorney called the judge an alcoholic and prophesied that the judge would not survive. The Supreme Court of Ohio characterized the proceeding as a "chaotic, unruly proceeding conducted outside the Rules of Evidence, the Code of Judicial Conduct and the Code of Professional Responsibility * * *." *Id.* at 44, 635 N.E.2d at 1263. The court found that Verbanic's attorney was compromising the interests of his client,

and the trial court did nothing to safeguard the litigant. *Id.* There is no such similar lack of decorum in this matter. Rather, counsel's decision not to object may have been trial strategy, and, therefore, this court will not second-guess appellant's counsel's decision. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. This assignment is without merit.

For the foregoing reasons, the judgment of the trial court is affirmed.

*Judgment affirmed.*

CHRISTLEY and NADER, JJ., concur.